UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
UNITED STATES OF AMERICA     )
                             )
v.                           )
                             )
JOHN FIDLER                  )     No. 15-10300-DPW
DANIEL REDMOND, and          )
ROBERT CAFARELLI,            )
                             )
          Defendants         )
_____ )

**DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

On September 1, 2016, Magistrate Judge Bowler issued her Report and Recommendation Re: Defendant's Motion to Dismiss Indictment (Docket Entry #60)("R&R"). In their Motion to Dismiss, defendants contended (1) that because the defendants were pursuing legitimate labor objectives, the charged conduct does not constitute either a substantive Hobbs Act violation or conspiracy to violate the Hobbs Act; (2) that the indictment failed to charge an essential element of the offense because it did not charge that the jobs that defendants were seeking for union members were "fictitious;" (3) that the indictment failed to charge an essential mens rea element of the offense, *i.e.*, that defendants knew that their conduct did not constitute pursuit of a legitimate labor objective; and (4) that the Hobbs Act, as applied, is void for vagueness. The Magistrate Judge rejected the defendants' arguments and recommended that defendants' Motion to Dismiss be denied. For the reasons addressed herein, the Magistrate Judge erred in her recommendation, and defendants' Motion to Dismiss should be granted.

## I.   DEFENDANTS' CONDUCT IS NOT ENCOMPASSED WITHIN THE REACH OF THE HOBBS ACT.

As the Superseding Indictment ("SI") plainly recognizes, Teamsters Local 25 is a bona fide, recognized labor organization, *see* SI ¶¶1, 2 ("Teamsters Local 25 . . . was a labor organization which represented over 11,000 employees in, among other things, the transportation, movie, and moving and trade show industries throughout New England;" its primary purpose "like any labor organization, is to negotiate and administer collective bargaining agreements with employers"), and the defendants, when they engaged in the conduct charged in the Superseding Indictment, were acting on behalf of that labor organization. As such, defendants were entitled, under §8(b)(7) of the NLRA to engage in recognitional picketing—picketing the object of which "is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees"—for a period of up to 30 days. 29 U.S.C. §158(b)(7)). *See* Proposed Brief of Amicus Curiae Massachusetts AFL-CIO in Support of Defendants' Motion to Dismiss (Doc. 64)("AFL-CIO Brief") at 17-18; Affidavit of Bradley T. Raymond (Doc. 71-1).[1] And also, as appears on the face of the indictment, picketing is what the defendants intended to do. *See* SI ¶6 ("During several subsequent telephone calls that same day, Harrington and another union official warned the producer that if Company A did not make a deal with Local 25, *they would start to follow them and picket*" (emphasis added)); SI ¶7 ("a

---

[1] The Magistrate Judge erroneously discounted the Raymond affidavit on the ground that it contained "contested and disputed evidence." R&R at 4 & n.3. It did not. Instead, the affidavit of Mr. Raymond, General Counsel of the International Brotherhood of Teamsters, explained the pertinent *law* pertaining to picketing by labor organizations. That law rightly could "provide a basis to dismiss the Superceding Indictment." *See id. See also* Defendants' Memorandum in Reply to Government's Opposition to Defendants' Motion to Dismiss Indictment (Doc. 71)("Reply") at 2-3.

representative from the City of Boston called the Omni Parker House to inform it that Local 25 was planning *to picket* Company A's filming . . . ." (emphasis added)); SI ¶8 (an individual from the Omni Parker House notified Company A that, despite their prior agreement, the Omni Parker House would no longer permit Company A to use its location to film because the hotel did not want to be associated *with a Local 25 picket*" (emphasis added)); SI ¶9 (Local 25 official told Company A that "Local 25 would be *sending fifty guys to picket*" (emphasis added)). When individuals are engaged in legitimate labor activity, of which picketing is surely a part, they are insulated from prosecution under the Hobbs Act even for considerably more violent conduct than is alleged to have occurred here.  Simply put, the Hobbs Act "does not apply to the use of force to achieve legitimate labor ends." *United States v. Enmons*, 410 U.S. 396, 401 (1973).

As the  Magistrate Judge recognized, "[g]enerally speaking, picketing in the context of the collective bargaining process of bona fide negotiations between a union and an employer is . . . a legitimate labor objective even when it engenders violence." R&R at 16.[2] *See United States v. Gibson*, 726 F.2d 869, 872 (1st Cir. 1984)(noting in the context of a dispute between union and nonunion employer that "[i]t is well-known that picketing may engender violence to persons and property. It is for this reason that the Hobbs Act excludes from its reach the use of force to achieve legitimate labor ends" (internal quotation marks omitted)). Defendants were seeking just such a legitimate labor end when they sought to compel Company A to replace the nonunion employees it had hired with members of Local 25 to perform necessary and wanted services, and

---

[2] Although not charged in the indictment, it should be noted that a union official emailed a collective bargaining agreement to the producer for Company A on June 9, 2014, after a series of telephone calls between the producer and union officials.

the Superseding Indictment therefore fails to charge cognizable Hobbs Act offenses.[3]

Contrary to the Magistrate Judge's conclusion, the allegations of the indictment do not "readily allow[] for a finding that defendants were not engaged in recognitional picketing." R&R at 17. As discussed above, the indictment is replete with references to picketing activity. Threats to shut down production if the employer does not agree to enter into a collective bargaining agreement and hire union workers, *see* R&R at 17, are not inconsistent with recognitional picketing. Indeed, threats to disrupt the employer's business are standard fare in the union negotiation context, and, under *Enmons*, such threatening conduct is immune from prosecution under the Hobbs Act if those threats were made, as here, in pursuit of a legitimate labor end. As a union representative, Harrington had every right not to care about Company A's wish to proceed with the nonunion workers it had hired rather than hiring union workers to perform the needed work. *See* R&R at 17.[4] Union officials are not required to meekly back away when an employer insists on using the services of nonunion workers. Instead, they are privileged under the NLRA to seek to reverse that decision through picketing for up to 30 days, far longer than the few hours at issue here.

That Company A had already hired all the drivers it needed and told Harrington so, *see* R&R at 17, is of no moment. Services do not become "imposed, unwanted, unnecessary and superfluous" simply because the employer has hired nonunion workers to perform them. *See* R&R at 21. Instead, it is a legitimate labor objective to seek to require an employer to replace

---

[3] Defendants incorporate by reference the arguments advanced in their Motion to Dismiss, their Reply Memorandum, and in the AFL-CIO Brief.

[4] The Magistrate Judge interpreted Harrington's statement as meaning that he did not care whether Company A recognized Local 25. R&R at 17 n.9. But that is not what the indictment

nonunion workers with union workers. This was precisely the result reached in *United States v. Kirsch*, 2015 WL 1472122 (W.D.N.Y. March 31, 2015). In *Kirsch*, the court rejected the government's theory that the use or threatened use of violence to force employers to replace nonunion workers with union workers constituted the extortion of wages and benefits to be paid by an employer for "unwanted, unnecessary, and superfluous labor." Noting that that terminology was drawn from the indictment in *Green*, the court found *Green* instructive regarding what "labor" meant in the phrase "unwanted, unnecessary, and superfluous labor" *id.* at *3, noting that in both *Green* and the case before it the issue concerned money paid for the *services* of laborers. That being the case, "[w]ith the allegations in *Green* as the genesis of the government's property allegations here," as they are in this case, the term "labor" in the phrase 'unwanted, unnecessary, and superfluous labor" – analogous to the "imposed, unwanted, unnecessary and superfluous services" language used in the indictment in this case –

> must refer to the work to be performed (i.e., *services* of laborers) rather than to a particular laborer. In other words, the wages and benefits at issue must have been paid for *work* that was "unwanted, unnecessary, and superfluous," rather than to a particular *individual* who may have been "unwanted, unnecessary, and superfluous."

*Id.* at *3 (emphasis in original). The cases on which the government relied, the court continued, involved the hiring of unneeded workers, not, as in that case, replacement of non-union workers with union workers. Where the latter was concerned, "even assuming that the replacement workers were unwanted by the employer (perhaps because it had to pay higher wages and benefits), and even assuming that the union workers were unnecessary (perhaps because the employer already had a non-union employee performing the job), *under no circumstances* were

---

charges. *See* SI ¶6.

the so-called replacement union workers . . . superfluous, because it is undisputed that the employers genuinely wanted and needed the work completed." *Id.* at *5 (emphasis added).[5] Based on its ruling, the court granted judgments of acquittal on all counts and racketeering acts predicated upon the replacement of non-union workers by union workers to perform needed work.

Judge Casper apparently agreed with the result in *Kirsch*. In *United States v. Perry*, No. 12-10293-DJC, she instructed the jury that it was a legitimate labor objective "for unions to identify work that is being performed by non-union workers or volunteers that could be performed by union members and to attempt to obtain that work." Doc. 806 at 224.

The same is true in this case: Company A "genuinely wanted and needed the work completed" and had hired non-union workers to perform the necessary services. The services themselves were entirely needed and wanted and were neither imposed nor superfluous. That it was Company A's preference to continue to use the non-union employees it had hired rather than hire members of Local 25 does not transform the *services* to be performed into "imposed, unwanted, unnecessary and superfluous" ones. Contrary to the Magistrate Judge's assessment, R&R at 6 n.4, the factual allegations of the superseding indictment cannot be fairly read to charge that the defendants were seeking to force Company A to hire *additional*, unnecessary workers. The Magistrate Judge simply assumed, from the face of the indictment, that defendants

---

[5] The Second Circuit addressed the concept of "imposed, unwanted, superfluous and fictitious labor services" in *United States v. Robilotto*, 828 F.2d 940 (1987). *Robilotto* involved a labor union's requirement that a film production company employ "cover drivers." The cover drivers were not members of the union, performed no work, and were incapable of performing the jobs that they purportedly were covering, yet had to be paid union wages. The *Robilotto* court found that cover drivers were "unwanted, superfluous and fictitious labor services."

were seeking to force Company A to hire additional workers, as opposed to seeking to have union members replace the nonunion workers that Company A had hired and actually performs work that the company wanted and needed. *See* R&R at 20-21. But the indictment does not so charge. The question is not whether Company A had any need for additional services but instead whether it needed the work done that Local 25 was offering to do. That it did want and need the work is evident from the fact that it had hired nonunion workers to do it. As previously discussed, the fact that Company A had already hired nonunion workers for all available positions is not dispositive, as the Magistrate Judge treats it. *See* R&R at 21. That Company A did not want to hire union workers does not mean that it was not a legitimate labor objective for Local 25 to seek to obtain the nonunion jobs for union workers. The indictment therefore charges conduct outside the compass of the Hobbs Act and should be dismissed.

Nor can the picketing at the Milton restaurant correctly be labeled "peripheral" or "collateral." R&R at 18. It was the entire reason for the defendants' presence there. The legality *vel non* of recognitional picketing is a central concern of the NLRA, and, as such, the exemption from *Garmon* preemption addressed in *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 977-98 (1st Cir. 1995), for regulated activity that "is merely a peripheral or collateral concern of the labor laws" is inapplicable.  In *Tamburello*, in which the plaintiff alleged Hobbs Act extortion as RICO predicates, the First Circuit held that extortion claims under RICO were subject to the primary jurisdiction of the NLRB. *Id.* at 973, 975. In dismissing the case on preemption grounds, the Court first noted that "Congress has not made an exception to the NLRB's primary jurisdiction for claims alleging extortion." *Id.* at 977. Because the Hobbs Act is a "generic law

---

*Robilotto*, 828 F.2d at 945.

prohibiting extortion," "a court was therefore forced to look to the labor law to define the alleged illegal conduct." *Id.* at 978. Since the legality of the conduct hinged on the application of the NLRA, the Court held that the NLRB had exclusive jurisdiction to resolve the claim. *Id.* Whether or not the defendants violated the Hobbs Act turns on whether the defendants were seeking to achieve legitimate union objectives, and that determination necessitates analysis under the NLRA. Because the government's contentions fall squarely within the jurisdiction of the NLRB, the indictment should be dismissed.

## II. THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE THAT THE SERVICES WHICH THE DEFENDANTS WERE SEEKING TO HAVE LOCAL UNION MEMBERS PROVIDE WERE FICTITIOUS.

In reaching its conclusion that the Hobbs Act did not apply to the use of force to achieve legitimate labor ends, the Supreme Court noted that "the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoffs, and where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous *and fictitious* services of workers." *Enmons*, 410 U.S. at 400 (emphasis added).  For that latter proposition, the Court cited two cases: *United States v. Green*, 350 U.S. 415 (1956), and *United States v. Kemble*, 198 F.2d 889 (3d Cir. 1952).  The *Enmons* Court's "imposed, unwanted, superfluous and fictitious" language was derived from *Green*, in which union members sought to force an employer to hire "swampers," employees who scouted ahead of approaching bulldozers at work sites to warn of upcoming hazards. The employer had never hired swampers and had no intention of doing so. *See United States v. Green*, 246 F.2d 155, 158-59 (7th Cir. 1957). Thus, *Green* involved the use of force and violence to create a job that did not exist, and the services offered by the union

8

were, therefore, "imposed, unwanted, superfluous, and fictitious." Similarly, in *Kemble*, the defendant, "understanding that Leonard did not want or need a helper and was not authorized to employ one, nevertheless forcibly insisted that Leonard pay $10, described as a day's wages, for a supernumerary to do what Leonard himself was paid to do and was accomplishing when [defendant] intervened."  198 F.2d at 890. *Kemble*, unlike this case, did not involve an effort to compel an *employer* to hire union workers but, instead, extortion of money from an *employee* to pay for an unneeded "helper." *Kemble* may not have used the word "fictitious" to describe the services which the defendant was demanding payment for, but the "helper" services were every bit as fictitious as the swamper services in *Green*, which is no doubt why the Supreme Court cited *Kemble* for the proposition that seeking wages for "imposed, unwanted, superfluous and fictitious services" violates the Hobbs Act.

Notably, the *Kemble* Court "carefully limited its holding," *Enmons*, 410 U.S. at 409, stating that it was *not* considering "the normal demand for wages as compensation for services desired by or valuable to the employer." *Id.* As addressed in the preceding section, that is precisely the activity in which the defendants in this case were engaged – seeking the employment of union workers to perform "services desired by or valuable to" Company A. While the *Enmons* Court did, as the Magistrate Judge notes, quote "imposed, unwarranted, and superfluous" language from *Kemble* and *United States v. Local 807*, 315 U.S. 521 (1942), R&R at 14, it did not, contrary to the Magistrate Judge's assessment, use the phrases "imposed, unwanted, superfluous and fictitious services" interchangeably with "imposed, unwarranted, and superfluous services." R&R at 14-15.  When choosing its own articulation of the conduct in the labor context which does fall within the Hobbs Act, the Court selected the "imposed, unwanted,

superfluous *and fictitious* services" formulation. And that distinction is important. That language may not be part of holding in *Enmons*, *see* R&R at 15, but it nonetheless represents a significant choice on the Court's part. In swapping "unnecessary" —a synonym for the already-included "superfluous"— for "fictitious" in the charging paragraphs of the indictment, the government has eliminated a significant narrowing principle from the Supreme Court's formulation and charged instead a formulation that encompasses within it the legitimate labor end of obtaining real jobs for union workers to perform services that the employer needs and wants. Only if "fictitious" is included in the definition of conduct that violates the statute can the critical distinction be maintained between seeking real jobs—jobs that the employer has filled with nonunion workers—for union workers, which does not violate the Hobbs Act, and seeking to force employers to pay for services they do not need—known in labor parlance as "featherbedding"— which does.

The Magistrate Judge also pointed to the "unwanted, unnecessary, and superfluous labor" language in which the indictment in *United States v. Kirsch*, 2015 WL 1472122 (W.D.N.Y. Mar. 31, 2015), was couched. R&R at 15 n.7. That decision was not concerned with the sufficiency of the indictment but instead with the sufficiency of the evidence to support the defendant's Hobbs Act convictions. In ruling that a number of those convictions would be reversed for evidentiary insufficiency, the court held that "unwanted, unnecessary, and superfluous labor" did not "include the replacement of a non-union worker with a union worker to perform genuine, needed work." *Id.* at *5. In contrast, the court upheld the defendant's conviction on a count that alleged that the defendant had used threats to induce the employer to hire a compressor operator from his local union, which the employer declined to do because the compressor was being operated by a

member of the painters' local.  *Id.* at *6. The distinction lies in the reality of the job: in the counts which were  reversed, there were jobs that could have been performed by local union members, but in the count that was affirmed, there was no job for the defendant's local to perform, as it was already being performed by a union member. Thus, in a real sense, *Kirsch* turned on whether the job at issue was fictitious or not, regardless of the language of the indictment. *Kirsch* does not, therefore, support the  Magistrate Judge's rejection of the defendants' argument.

## III.   THE INDICTMENT MUST BE DISMISSED BECAUSE BOTH COUNTS FAIL TO ALLEGE AN ESSENTIAL *MENS REA*  ELEMENT OF THE OFFENSE.

In their Motion to Dismiss, defendants contended that *Enmons*, read in conjunction with the First Circuit's decision in *United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989), requires that, to convict defendants of a Hobbs Act conspiracy or substantive offense, the government must prove beyond a reasonable doubt that the defendants did not believe that their actions were in pursuit of legitimate labor ends, *i.e.*, that the defendants knew that their actions were not in pursuit of legitimate labor objectives and that Local 25 members were not legally entitled to the wages they sought. *See* Motion to Dismiss at 16-19. The Magistrate Judge apparently agreed with the defendants, as she discussed only whether the allegations of the indictment "necessarily or fairly import guilty knowledge." R&R at 24, *quoting United States v. McLennan*, 672 F.2d 239, 242 (1st Cir. 1982). Contrary to the Magistrate Judge's conclusion, they do not.

That Harrington (who is no longer one of the defendants at issue in defendants' Motion to Dismiss)[6] said that he did not care about Company A, R&R at 24, does not import knowledge on

---

[6] It is anticipated that Harrington will be entering a plea of guilty.

11

the part of Harrington himself, much less the remaining defendants. As previously addressed, Harrington, as a union representative, had every right not to care about Company A's wish to proceed with the nonunion workers it had hired rather than hiring union workers to perform the needed work. Nor does Harrington's saying that he wanted Company A to hire union workers, R&R at 24, "necessarily or fairly" import knowledge on the part of the defendants that they were not pursuing a legitimate labor end. Causing employers to replace nonunion workers with union workers *is* a legitimate labor end. Similarly, that Company A told Harrington that it had already hired all the drivers it needed, R&R at 24, does not supply knowledge on defendants' part that continuing to seek jobs for union workers was no longer a legitimate labor objective. Defendants were not required to take no for an answer; it was entirely legitimate for them to seek to change the company's mind and agree to replace nonunion workers with union workers and, under *Enmons*, to employ threats to achieve that purpose without subjecting themselves to prosecution under the Hobbs Act. Everything that Harrington and Redmond said could equally have been said in pursuit of both legitimate and illegitimate labor ends, and the fact that the statements were made (according to the indictment) cannot supply indicia of knowledge that defendants' statements and actions were wrongful.

The statements identified by the Magistrate Judge  do not "necessarily and fairly" import knowledge of wrongdoing by any of the defendants. And, indeed, the Magistrate Judge only concluded that these statements showed that Harrington and Redmond knew that they had no legal right to conduct themselves as they did. The only other allegations of the indictment to which the Magistrate Judge pointed were the use of the words "extortion" and "wrongful." In their Motion to Dismiss, defendants contend that the *Sturm* construction of "wrongful" in the

Hobbs Act must extend to all forms of extortion in the labor context, not just the use of economic fear that was directly at issue in *Sturm*. Motion to Dismiss at 17-18. The  Magistrate Judge did not resolve this issue, pointing only to the *Sturm* knowledge requirement where use of economic fear is concerned. *See* R&R at 24, 34. But the indictment charges more than wrongful use of fear of economic harm:  each count charges that the defendants sought to obtain "money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services" with the consent of Company A, "which consent was induced by the wrongful use of actual and threatened *force*, *violence*, and fear of economic and *physical* harm." Ind. ¶¶13, 15 (emphasis added). The government disputes that the *Sturm* knowledge requirement applies to cases of extortion involving force, violence, or threat of physical harm. *See* Government's Opposition to Defendants' Motion to Dismiss Indictment (Doc. 62-1) at 24 n.4 (stating that knowledge by defendants that their actions were in pursuit of illegitimate labor objectives "need [not] be alleged in the Indictment or even proven with respect to the other extortionate means used by defendants, including actual fear of force, violence, and fear of physical harm").

It is axiomatic that, to be sufficient, an indictment must "contain[] the elements of the offense charged." *Hamling v. United States*, 418 U.S. 87, 117 (1974). *See, e.g., Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *United States v. Berk*, 652 F.3d 132, 137 (1st Cir. 2011); *United States v. Morosco*, 67 F.Supp.3d 483, 487 (D.Mass. 2014). There must be "reasonable assurance from the face of the indictment that the grand jury found probable cause on each of the essential elements which underlie the verdict of the petit jury."  *United States v. Goldstein*, 502 F.2d 526, 529 (3d Cir. 1974). Where the government does not even recognize that knowledge is a required element for all forms of extortion in the labor context, there can be no

such assurance.

## IV.    THE HOBBS ACT, AS CONSTRUED IN *ENMONS*, IS VOID FOR VAGUENESS.

As construed in *Enmons*, use or threatened use of violence or economic fear is unlawful under the Hobbs Act only if defendants were not pursuing legitimate labor ends. *See* Section I, *supra.  Enmons* did not further define "legitimate labor ends" and offered only two examples of what might constitute illegitimate labor ends: the obtaining of personal payoffs, not here at issue, and "exact[ing] 'wage' payments from employers in return for imposed, unwanted, superfluous and fictitious services of workers." *Enmons*, 410 U.S. at 400. The "imposed, unwanted, superfluous and fictitious" language was taken by the Court from the indictment at issue in *United States v. Green*, 350 U.S. 415, 417 (1956). Neither *Green* nor *Enmons* further defined the meaning of "imposed, unwanted, superfluous and fictitious," a variant of which is charged in this indictment, which charges that defendants sought to obtain wages for "imposed, unwanted, unnecessary and superfluous services."

The Hobbs Act, as construed in *Enmons*, is void for vagueness as it fails to provide persons of ordinary intelligence with fair notice of what constitute "legitimate labor ends" or "imposed, unwanted, superfluous and fictitious services of workers." Because the Hobbs Act, as construed by *Enmons*, fails to provide this critical guidance, its application to the defendants in this case would violate the Due Process Clause of the Fifth Amendment.

The government violates the fundamental guarantee of the Fifth Amendment Due Process Clause "by taking away someone's life, liberty or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551, 2556

(2015), *citing Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). *See, e.g., Butler v. O'Brien*, 663 F.3d 514, 518 (1st Cir. 2011)("Under the Constitution, 'a criminal statute must give fair warning of the conduct that it makes a crime," *quoting Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)); *Precious Metals Associates, Inc. v. Commodities Futures Trading Comm'n*, 620 F.2d 900, 906 (1st Cir. 1980)("Fair play requires that notice of proscribed conduct be given the potential offender in advance of the offense"). "A statute must give fair warning, "in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003), *quoting McBoyle v. United States*, 283 U.S. 25, 27 (1931).

The Supreme Court made clear in *Johnson* that the fact that some conduct "clearly falls within the provision's grasp" does not make a vague statute constitutional. *Johnson*, 135 S.Ct. at 2560. Certain conduct in the labor context can, to be sure, plainly violate the Hobbs Act, such as the use or threat of violence by a defendant to obtain a personal payoff or the use or threat of violence to force an employer to engage in featherbedding by hiring more workers than are needed to do the job. In other labor contexts, however, how are labor representatives to know that pursuing a time-honored labor objective such as picketing to obtain a collective bargaining agreement or otherwise obtaining legitimate employment for members of the union local as replacements for the nonunion workers could violate the Hobbs Act and subject them to potential penalties of up to 20 years in prison (if indeed it does, which defendants contest)? What is a legitimate labor objective? Where real jobs with a real employer are at issue, what are "imposed, unwanted, superfluous and fictitious services" or, as charged in the indictment in this case, "imposed, unwanted, unnecessary and superfluous services?" Is a service unwanted,

unnecessary, and superfluous simply because an employer has already hired non-union workers to fill the available positions and does not want to replace them with union workers? The charged conduct does not even constitute a violation of the NLRA. The face of the statute plainly offers no guidance, nor does the construction of the statute by *Enmons*.

The Magistrate Judge suggests that the answers to such questions are sufficiently clear from *Enmons*, *Local 807*, and *Kemble* to avoid vagueness problems. *See* R&R at 30-32. But they are not. At issue in *Local 807* was the scope of the statutory exception to the Federal Anti-Racketeering Act which excluded from its coverage the use of force or violence to obtain "the payment of wages by a bona-fide employer to a bona-fide employee." 315 U.S. at 527. In that case, union truck drivers were stopping trucks driven by out-of-state truckers and charging them a per truck rate equivalent to a day's wages for a union driver to enter Manhattan. The defendants engaged in three different types of actions: (1) in some cases, the out-of-state driver was forced to turn his truck over to a defendant who then drove it into the city, unloaded it, loaded it with merchandise for the return trip, and then returned the truck to the out-of-state driver on the outskirts of the city; (2) in other cases, the defendants demanded and obtained the money, but their offers to do the driving/unloading were rejected; and (3) in still other cases, the defendants either did not offer to work or refused to work for the money when asked to. *See id.* at 526. Noting that "there is no conspiracy to violate the Act if the purpose of the defendants is actually to perform the services in return for the money, but there is a punishable conspiracy if their plan is to obtain money without doing the work," the "difficult issue," the Court said, "arises where defendants agree to tender their services in good faith to an employer and to work if he accepts the offer, but *agree further that the protection of their trade union interests requires*

16

*that he should pay an amount equivalent to the prevailing union wage even if he rejects their proffered services.*" *Id.* at 533 (emphasis added). Concluding that such an agreement fell within the exception, the Court continued, "the jury was bound to acquit the defendants if it found that their objective and purpose was to obtain by the use or threat of violence the chance to work for the money but to accept the money even if the employers refused to permit them to work." *Id.* at 538.

Thus, what prompted Congress to enact the Hobbs Act was the Court's holding that it was not a federal crime for union members to extort money from employers without performing services in return, which legislators regarded as a form of highway robbery. *See United States v. Enmons*, 410 U.S. 396, 403-04 (1973) *See also United States v. Green*, 350 U.S. 415, 417 (1956)(describing the holding in *Local 807* that "this exception covered members of a city truck drivers' union offering superfluous services to drive arriving trucks to their city destination *with intent, if the truck owners refused offer, to exact the wages by violence*"). As the Court later stressed in *Enmons*, "[i]t was repeatedly emphasized in the debates that the bill did not 'interfere in any way with any legitimate labor objective or activity'; 'there is not a thing in it to interfere in the slightest degree with any  legitimate activity  on the part  of labor  people or  labor  unions . . ..'" 410 U.S. at 404. Nothing in *Local 807* or *Enmons*' discussion of it provides fair notice that seeking to have an employer replace nonunion workers with union workers could constitute a violation of the Hobbs Act. Union workers in the present context would have performed the work needed by Company A and been entitled as of right to the wages payable for the services they rendered.

In *Kemble*, the defendant, "understanding that Leonard did not want or need a helper and

was not authorized to employ one, nevertheless forcibly insisted that Leonard pay $10, described as a day's wages, for a supernumerary to do what Leonard himself was paid to do and was accomplishing when [defendant] intervened." 198 F.2d at 890. *Kemble* involved the services of an additional and superfluous worker performing a sham job, and *Enmons*' discussion of it does not provide notice that seeking to replace nonunion workers with union workers violates the Hobbs Act if accompanied by threats or force.

The Magistrate Judge concluded that the discussion of *Local 807* and *Kemble* in *Enmons* "provide[s] fair notice to persons of common intelligence that forcing a non-union company to pay money in the form of wages for unwanted services for additional (as opposed to replacement) workers to perform unnecessary work already being performed by existing, hired workers to avoid a threatened shut down of production falls within the reach of the statute." R&R at 31-32. That is as may be, but that is not what the defendants were doing, nor is it what the indictment fairly charges them with doing.

In addressing this issue, the Court should consider the potential First Amendment implications of expansive applications of the Hobbs Act. To "avoid chilling the exercise of First Amendment rights," "the Constitution requires a greater degree of specificity in cases involving First Amendment rights." *National Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011). *See also United States v. Butler*, 663 F.3d 514, 520 (2d Cir. 2011)(distinguishing *Kolender* on the ground that its analysis "arises in the First Amendment context in which there are enhanced concerns about arbitrary enforcement under the void for vagueness doctrine where there is the potential for arbitrarily suppressing First Amendment liberties"). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden

areas were clearly marked." *Grayned v. Rockford*, 408 U.S. 104, 109 (1972).

Such union activities as picketing and other forms of "dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940). *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc*., 425 U.S. 748, 762 (1976)("[I]t has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome"); *Thomas v. Collins*, 323 U.S. 516, 534 (1945)("The rights of assembly and discussion are protected by the First Amendment"); *United States v. Larson*, 807 F.Supp.2d 142, 164 (W.D.N.Y. 2011)("It is undisputable that many activities by union members, including speeches, picketing, and boycotting are entitled to First Amendment protection").

While use or threats of violence are not protected by the First Amendment, at least part of the activity in which the defendants engaged (if not all) was nothing more than lawful, protected picketing.   The interface between protected First Amendment activity in the labor context and use of force to achieve labor objectives requires that, for labor representatives to be subjected to prosecution under the Hobbs Act, the statute must speak considerably more specifically than it does now as to where the line between conduct which violates the Hobbs Act and that which does not falls. *Enmons* recognized that use of force in labor disputes is a common extension of strikes or picketing activity – so common that legislators feared its inclusion within the ambit of the Hobbs Act.

The Magistrate Judge concluded that "the specific intent and wrongfulness requirement of the Hobbs Act not only renders the statute less vague, it 'ensures that its application is

sufficiently constrained to reach only unprotected speech.'" R&R at 35, quoting *United States v. Coss*, 677 F.3d 278, 290 (6th Cir. 2012). *See also* R&R at 34 ("specific intent is part and parcel of a Hobbs Act conviction," *quoting United States v. Boylan*, 898 F.2d 230, 253 (1st Cir. 1990)). "Specific intent" and "wrongfulness" do not, however, embody fair notice, as those terms do not clarify the conduct that falls within the reach of the statute.  What must the defendant specifically intend for his conduct to violate the Hobbs Act? What conduct is and is not wrongful under the Hobbs Act in the labor context? The simple employment of those terms does nothing to answer important questions about their scope and meaning or the scope and meaning of the Hobbs Act where labor union activities are concerned. And while, after *Sturm*, the statute may include a mens rea requirement where fear of economic harm is concerned, *see* R&R at 34, unless the construction urged by defendants that the same knowledge requirement also applies to other extortionate means in the labor context, including actual and threatened force and violence—a substantial portion of the acts with which defendants are charged, *see* Section III, *supra*—then there is not a scienter requirement that can save the statute from unconstitutional vagueness.

## V.      APPLICATION OF THE RULE OF LENITY.

The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). *See, e.g., United States v. Skilling*, 561 U.S. 358, 410 (2010)("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); *Perez-Olivio v. Chavez*, 394 F.3d 45, 53 (1st Cir. 2005)("The rule of lenity provides that where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant"); *United States v.  Tapia-Escalera*, 356 F.3d 181, 188 (1st Cir. 2004); *United States v. Bowen*, 127 F.3d  9, 13-15 (1st Cir. 1997). Critically, the

rule of lenity "ensures fair warning by resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266.

> In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. . . . This principle is founded on two policies that have long been part of our tradition. First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. . . . Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should. . . . . Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

*United States v. Bass*, 404 U.S. 336, 347-48 (1971)(internal quotation marks and citations omitted).

Application of the rule of lenity is especially appropriate given the severe penal consequences which flow from removing conduct from the ambit of relatively minor state criminal offenses and elevating it to the status of a 20-year federal felony." "When choice has to be made between two readings of what Congress has made a crime, it is appropriate, before [courts] choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."*United States v. Rosa-Ortiz*, 348 F.3d 33, 42 (1st Cir. 2003). Thus, to the extent that the Hobbs Act is ambiguous regarding whether replacement of nonunion workers with union workers is a legitimate labor objective, it should be construed not to encompass such conduct. At a minimum, the Hobbs Act should be construed in the labor context to require that the government must prove beyond a reasonable doubt that the defendant knew that his actions were not in furtherance of a legitimate labor objective. Defendants have contended in Section III,

*supra*, that such a requirement flows from the conjunction of *Enmons* and *Sturm*, but it is also required to alleviate the vagueness concerns which application of the Hobbs Act in the labor context manifestly presents.


Respectfully submitted,
JOHN FIDLER
By his attorney,

**/s/ Timothy P. O'Connell**
Timothy P. O'Connell
BBO# 376725
C-8 Shipway Place
Charlestown, MA 02129
(617) 285-3215
tpocsr@gmail.com

Respectfully submitted,
ROBERT CAFARELLI
By his attorney,

**/s/ Carmine P. Lepore**
Carmine P. Lepore
BBO #564603
One Sprague Street
Revere, MA 02151
(781) 286-8800
CL524@aol.com

Respectfully submitted,
DANIEL REDMOND
By his attorney,

**/s/ Oscar Cruz, Jr.**
Oscar Cruz, Jr.
Federal Public Defender Office
51 Sleeper Street
Boston, MA 02210
(617) 223-8061
Oscar_Cruz@fd.org


## CERTIFICATE OF SERVICE

I, Carmine C. Lepore, hereby certify that on this 13th day of September, 2016, I caused the within Objections to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Carmine P. Lepore**
Carmine P. Lepore